
Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | John W. Darrah | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 4266 | **DATE** | 3/21/2002 |
| **CASE TITLE** | BEVERLY THOMPSON vs. DAVID E. WAGNER | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)   ☐ General Rule 21   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).
(10) ■ [Other docket entry]  Defendants' Federal Rule of Appellate Procedure 8(a) motion to stay proceedings is denied as moot. Jury trial set for 3/25/02 is vacated. Enter Memorandum Opinion And Order. Plaintiff's motion for summary judgment is denied, and defendants' motion for summary judgment is granted.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | Document Number |
|---|---|---|---|---|
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | **MAR 2 5 2002** | |
| | Notified counsel by telephone. | | date docketed | |
| ✓ | Docketing to mail notices. | | | |
| ✓ | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| LG | courtroom deputy's initials | Date/time received in central Clerk's Office | date mailed notice / mailing deputy initials | |

# UNITED STATES DISTRICT COURT,
# NORTHERN DISTRICT OF ILLINOIS,
# EASTERN DIVISION

BEVERLY THOMPSON,

    Plaintiff,

v.

DAVID E. WAGNER, Star No. 634, and
KEITH GARDNER, Star No. 182,

    Defendants.

Case No. 01 C 4266

The Honorable John W. Darrah

**DOCKETED MAR 2 5 2002**

## MEMORANDUM OPINION AND ORDER

Plaintiff, Beverly Thompson ("Thompson"), filed a two-count amended complaint against Defendants, David E. Wagner ("Wagner") and Keith Gardner ("Gardner) (collectively "Officers"), alleging violation of her civil rights under the Civil Rights Act of 1871, 42 U.S.C. § 1983 (2002). Count I alleges that Thompson's arrest without probable cause deprived her of her rights under the Fourth Amendment to the United States Constitution. Count II alleges that the seizure of her rings without probable cause also deprived her of her rights under the Fourth Amendment.

Thompson and the Officers have moved for summary judgment pursuant to Federal Rule of Civil Procedure 56. For the reasons that follow, Thompson's Motion for Summary Judgment is denied, and the Officers' Motion for Summary Judgment is granted.

## LEGAL STANDARD

Summary judgment is appropriate when there remains no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Cincinnati Ins. Co.*

-1-



*v. Flanders Elec. Motor Serv., Inc.*, 40 F.3d 146, 150 (7th Cir. 1994). "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Thus, although the moving party on a motion for summary judgment is responsible for demonstrating to the court why there is no genuine issue of material fact, the non-moving party must go beyond the face of the pleadings, affidavits, depositions, answers to interrogatories, and admissions on file to demonstrate through specific evidence that there remains a genuine issue of material fact and show that a rational jury could return a verdict in the non-moving party's favor. *Celotex*, 477 U.S. at 322-27; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254-56 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 923 (7th Cir. 1994).

Disputed facts are material when they might affect the outcome of the suit. *First Ind. Bank v. Baker*, 957 F.2d 506, 507-08 (7th Cir. 1992). When reviewing a motion for summary judgment, a court must view all inferences to be drawn from the facts in the light most favorable to the opposing party. *Anderson*, 477 U.S. at 247-48; *Popovits v. Circuit City Stores, Inc.*, 185 F.3d 726, 731 (7th Cir. 1999). However, a metaphysical doubt will not suffice. *Matsushita*, 475 U.S. at 586. If the evidence is merely colorable or is not significantly probative or is no more than a scintilla, summary judgment may be granted. *Anderson*, 477 U.S. at 249-250.

## BACKGROUND

The undisputed facts taken from the parties' Local Rule 56.1(a) & (b) statements of material facts (referred to herein as "Pl.'s 56.1" and "Def.'s 56.1") and exhibits are as follows.

Plaintiff, Thompson, has worked as a cake decorator at a Kroger grocery store in Ottawa, Illinois, for approximately twenty years. (Pl.'s 56.1 ¶ 14.) She has never been a defendant in a

criminal proceeding. (Pl.'s 56.1 ¶ 14.)

Wagner and Gardner were members of the Kane County Sheriff's Department ("the Department") and acting under color of state law at all relevant times. (Pl.'s 56.1 ¶ 4.) Wagner had worked for the Department for approximately eight or nine years and before that had worked as a United States Marshal. (Pl.'s 56.1 ¶ 4.) Wagner was a detective and Gardner's supervisor. (Pl.'s 56.1 ¶ 4.) Gardner was a detective and had worked for the Department for about four or five years. (Pl.'s 56.1 ¶ 4.)

On December 8, 2000, a complaint of deceptive practice was made by Diane Richardson to the Kane County Sheriff's Office ("Sheriff's Office"). (Def.'s 56.1 ¶ 1.) Ms. Richardson reported that on December 2 and 3, 2000, some individuals had used bad checks to purchase two diamond rings at her booth at the Kane County Flea Market. (Def.'s 56.1 ¶ 1.) Officer Seidleman of the Sheriff's Office prepared a report. (Def.'s 56.1 ¶ 1.) This report was forwarded to Wagner for investigation. (Def.'s 56.1 ¶ 2.)

Wagner spoke with Ms. Richardson on December 15, 2000, and obtained copies of the checks which had been written for the rings and descriptions of the rings. (Def.'s 56.1 ¶ 3.) One ring was a men's ring with a 1.05 carat diamond, allegedly worth approximately $6,405. (Pl.'s 56.1 ¶ 5.) The other was a women's ring with a 1.08 carat diamond. (Pl.'s 56.1 ¶ 5.)

The checks had been written by Chuck Berry ("Berry") for a total of $10,475. (Def.'s 56.1 ¶ 4.) On December 21, 2000, Wagner and Gardner met with Berry at the Sheridan Correctional Center, where he was being held on unrelated charges. (Def.'s 56.1 ¶ 5.) After waiving his *Miranda* rights, Berry confessed to writing the checks used to purchase the two diamond rings in question. (Def.'s 56.1 ¶ 6.) Berry also stated that Calvin Meyers ("Meyers") and Jeremy Risch ("Risch") were

present for the purchase of the rings and that Meyers and Risch each currently possessed a ring. (Def.'s 56.1 ¶ 6.)

Wagner and Gardner subsequently interviewed Meyers and Risch. (Pl.'s 56.1 ¶ 7.) Risch admitted being present at the flea market but denied ever possessing the rings. (Def.'s 56.1 ¶ 7; Pl.'s 56.1 ¶ 9.)

Initially, Meyers admitted being present at the flea market but denied ever possessing the rings. (Def.'s 56.1 ¶ 8; Pl.'s 56.1 ¶ 9.) On May 16, 2001, Meyers admitted that he had possessed a two-carat diamond ring and had given it to his girlfriend, Delores Henry. (Def.'s 56.1 ¶ 9; Pl.'s 56.1 ¶ 10.)

On May 17, 2001, Meyers provided Wagner and Gardner with a written statement. (Def.'s 56.1 ¶ 9; Pl.'s 56.1 ¶ 10.) In his written statement, Meyers stated that Risch gave him a two-carat diamond ring which Meyers gave to Henry. (Pl.'s 56.1 ¶ 10.) Meyers stated that Henry removed the diamond from the stolen ring and placed it in one of her own rings. (Pl.'s 56.1 ¶ 10.) According to Meyers' statement, Henry then gave the ring in which she had placed the stolen diamond to her brother, Robert Thompson, in exchange for a car and that Robert Thompson then placed the stolen diamond in his wife's, Beverly Thompson's, wedding ring. (Pl.'s 56.1 ¶ 10.) Meyers stated that he believed Thompson wore her wedding set on her left hand. (Pl.'s 56.1 ¶ 10.)

On May 17, 2001, Meyers gave Wagner and Gardner a ring setting containing a cubic zirconia stone, which Meyers stated was the stolen ring from which Henry had removed the diamond. (Pl.'s 56. 1 ¶ 12.)

After speaking with Meyers on May 17, 2001, Gardner and Wagner went to the Kroger's bakery to question Thompson. (Def.'s 56.1 ¶ 10; Pl.'s 56.1 ¶ 13.) Neither Wagner nor Gardner had

met Thompson before May 17, 2001. (Def.'s 56.1 ¶ 10.)

Wagner and Gardner approached Thompson at the Kroger bakery and introduced themselves as police officers. (Def.'s 56.1 ¶ 11; Pl.'s 56.1 ¶ 19.) Wagner asked to speak to Thompson privately, and she led him and Gardner to the customer waiting area of the Kroger pharmacy. (Def.'s 56.1 ¶ 13; Pl.'s 56.1 ¶ 19.) Wagner and Gardner saw that Thompson was wearing two diamond rings, one on each hand. (Pl.'s 56.1 ¶ 20.) Wagner told Thompson that they believed that she was in possession of a stolen diamond and asked for her permission to take both her rings for identification. (Def.'s 56.1 ¶ 14; Pl.'s 56.1 ¶ 20.) Wagner also explained that the diamond would be returned to her if it was not stolen. (Def.'s 56.1 ¶ 14.) Wagner and Gardner told Thompson that she was not under arrest and that if she admitted her guilt she would not be arrested that day. (Pl.'s 56.1 ¶ 24.)

Thompson informed Wagner and Gardner that the rings she wore belonged to her and that she had proof. (Pl.'s 56.1 ¶ 25.) She held out both hands and permitted Wagner and Gardner to look them over. (Pl.'s 56.1 ¶ 25.) Wagner and Gardner could not determine whether Thompson was wearing contraband as neither officer had training or special knowledge about gems or jewelry. (Pl.'s 56.1 ¶ 26.)

Wagner and Gardner continued to ask Thompson to permit them to take her rings, and she continued to refuse. (Pl.'s 56.1 ¶ 27.) Wagner and Gardner testified that this caused them to be concerned that Thompson would hide the rings. (Def.'s 56.1 ¶ 16.)

Thompson then told the Officers that she wanted to call her husband and rose from the chair and began to walk away from the area where they remained seated. (Pl.'s 56.1 ¶ 28.) Wagner blocked Thompson from leaving, and he and Gardner secured her in handcuffs. (Def.'s 56.1 ¶ 17; Pl.'s 56.1 ¶ 28.)

Gardner believed that Thompson was committing, or about to commit, the crime of obstruction when she would not permit them to take the rings, said she was going to call her husband, and began to walk away. (Pl.'s 56.1 ¶ 29.) Wagner testified that he arrested her because he suspected the diamond on her left hand was stolen and that she was going to conceal or destroy it or leave the premises altogether. (Pl.'s 56.1 ¶ 29.)

Thompson agreed to calm down, remain with the Officers without handcuffs, and remove her diamond rings and give the rings to them. (Def.'s 56.1 ¶¶ 18, 19; Pl.'s 56.1 ¶ 33.) Wagner and Gardner removed the handcuffs and seized the rings but continued to keep Thompson in custody. (Pl.'s 56.1 ¶ 34.) Thompson was handcuffed for a total of five to ten minutes. (Def.'s 56.1 ¶ 20.) She did not sustain any physical injuries from the handcuffs or the removal of the rings. (Def.'s 56.1 ¶ 21.)

Wagner read Thompson her *Miranda* rights, as a "safeguard" to protect Wagner and Gardner in case Thompson felt like she was not free to leave. (Pl.'s 56.1 ¶ 35.) Wagner asked Thompson to sign a waiver of her *Miranda* rights, but Thompson refused as she was too upset to understand her rights. (Def.'s 56.1 ¶ 22; Pl.'s 56.1 ¶ 36.) However, Thompson indicated that she would speak with the Officers. (Pl.'s 56.1 ¶ 36.) Thompson again asked the Officers if she could telephone her husband. (Pl.'s 56.1 ¶ 36.)

Wagner and Gardner walked Thompson out of the building and placed her in a squad car. (Pl.'s 56.1 ¶ 37.) Thompson was in the squad car for about ten minutes. (Def.'s 56.1 ¶ 24.)

Robert Thompson arrived and saw his wife in the squad car. (Pl.'s 56.1 ¶ 38.) He spoke with Wagner outside of the car while Gardner kept Thompson in the car. (Pl.'s 56.1 ¶ 38.) Mr. Thompson signed a property receipt, and Officers Wagner and Gardner retained the rings. (Pl.'s 56.1 ¶ 39.)

They then released Thompson from custody. (Pl.'s 56.1 ¶ 39.)

On May 18, 2001, Mr. Thompson faxed the diamond insurance documentation to Wagner and Gardner. (Pl.'s 56.1 ¶ 41.) After examination, it was determined that the diamond in the wedding set belonged to Thompson, and the rings were returned to her. (Def.'s 56.1 ¶ 26; Pl.'s 56.1 ¶ 42.)

## DISCUSSION

Thompson has moved for summary judgment. Thompson argues that summary judgment is appropriate because the Officers lacked probable cause to arrest her and seize her jewelry, and her arrest and the seizure of her jewelry without a warrant was unreasonable and not within one of the exceptions to the warrant requirement.

The Officers have also moved for summary judgment. They argue that summary judgment is appropriate because there was probable cause for Thompson's arrest for obstructing a peace officer and that they are entitled to qualified immunity for their actions on May 17, 2001.

The Fourth Amendment prohibits unreasonable searches and seizures. U.S. Const. amend. IV. Warrantless arrests in public places are permitted under the Fourth Amendment if the arresting officer has probable cause. *Sparing v. Village of Olympia Fields*, 266 F.3d 684, 688 (7th Cir. 2001) (citing *United States v. Watson*, 423 U.S. 411, 417-24 (1976)). Probable cause for an arrest exists if the officer "'reasonably believe[s], in light of the facts and circumstances within [the officer's] knowledge at the time of the arrest, that the suspect had committed or was committing an offense.'" *United States. v. Carrillo*, 269 F.3d 761, 766 (7th Cir. 2001) (quoting *United States v. Hayes*, 236 F.3d 891, 894 (7th Cir. 2001)). Police officers may draw reasonable inferences based on their training and experiences in determining whether suspicious circumstances rise to the level of

probable cause. *Carrillo*, 269 F.3d at 766 (citing *United States v. Faison*, 195 F.3d 890, 893 (7th Cir. 1999)). Whether probable cause exists "turns on the information known to the officers at the moment the arrest [was] made, not on subsequently received information." *Carrillo*, 269 F.3d at 766 (citing *Spiegel v. Cortese*, 196 F.3d 717, 723 (7th Cir. 2000)). The determination of the existence of probable cause is based on the totality of the circumstances. *Carrillo*, 269 F.3d at 766-67 (citing *United States v. Scott*, 19 F.3d 1238, 1242 (7th Cir. 1994)). Because the issue of whether probable cause for an arrest existed is linked to the determination of whether the arresting officers are shielded from liability in a § 1983 action by qualified immunity, the two issues will be analyzed together below.

Qualified immunity shields police officers "'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Sparing*, 266 F.3d at 687 (quoting *Wilson v. Layne*, 526 U.S. 603, 609 (1999) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982))). The defense of qualified immunity is not available to "'the plainly incompetent or those who knowingly violate the law.'" *Sparing*, 266 F.3d at 688 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

The plaintiff bears the burden of defeating an assertion of qualified immunity. *Sparing*, 166 F.3d at 688 (citations omitted). "When presented with a defense of qualified immunity, courts must (1) determine whether the plaintiff has alleged the deprivation of an actual constitutional right and (2) if so, determine whether that right was clearly established at the time of the alleged violation." *Sparing*, 266 F.3d at 688 (citations omitted). The right to be free from arrest without probable cause is well-settled.

The Officers will be entitled to qualified immunity, and Thompson's § 1983 action against

them barred if a reasonable officer could have believed that, in light of the facts and circumstances within the Officers' knowledge at the time of the arrest and clearly established law, Thompson had committed or was committing an offense. *See Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (quoting *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)). A reasonable but mistaken belief that probable cause exists is sufficient for entitlement to qualified immunity. *Hunter*, 502 U.S. at 227. In cases involving the issue of whether probable cause existed to support an arrest, "'the case should not be permitted to go to trial if there is *any* reasonable basis to conclude that probable cause existed." *McDonnell v. Cournia*, 990 F.2d 963, 968 (7th Cir. 1993) (quoting *Cross v. City of Des Moines*, 965 F.2d 629, 632 (8th Cir. 1992)). The question of immunity is one for the court. *Hunter*, 502 U.S. at 228.

"Federal law asks only whether the officers had probable cause to believe that the predicate offense, as the state has defined it, has been committed." *Williams v. Jaglowski*, 269 F.3d 778, 782 (7th Cir. 2001) (citing *Richardson v. Bonds*, 860 F.2d 1427, 1432 n.4 (7th Cir. 1988)). A person obstructs a police officer when he or she "knowingly resists or obstructs the performance by one known to the person to be a peace officer . . . of any authorized act within his official capacity commits a Class A misdemeanor." 720 Ill. Comp. Stat 5/31-1(a) (2002). A person who merely argues with the police officer about the validity of the arrest does not commit the crime of obstruction. *People v. Raby*, 40 Ill. 2d 392, 399 (1968). Rather, obstruction requires "some physical act which imposes an obstacle which may impede, hinder, interrupt, prevent or delay the performance of the officer's duties, such as going limp, forcefully resisting arrest or physically aiding a third party avoid arrest." *Raby*, 40 Ill. 2d at 399. An act of physical resistance is necessary; silence "in the face of requests for identifying information, or even supplying false information, is not

enough to constitute obstruction." *Williams*, 269 F.3d at 782.

There was some reasonable basis for the Officers to conclude that probable cause existed, that Thompson was in possession of stolen property and committing or was about to commit the crime of obstruction. Berry, who had confessed to stealing the rings by deceptive practice, had told the Officers that he had given the rings to Meyers and Risch. Meyers corroborated Berry's story, telling the Officers that he had possessed one of the stolen rings and had given it to his girlfriend who gave it to Thompson's husband.

Thompson argues that Wagner and Gardner lacked probable cause because the stolen rings contained 1.05- and 1.08-carat diamonds and that Meyers' written statement described a two-carat diamond. Thompson further argues that no reasonable officer would have mistaken a two-carat for a one-carat diamond. The fact that Meyers told the Officers that the ring was a two-carat and not a one-carat diamond is immaterial. Neither Officer had special knowledge or training about gems or jewelry. Furthermore, Thompson has not presented any evidence that a two-carat diamond looks significantly different than a one-carat diamond to the untrained eye.

When the Officers spoke with Thompson, after introducing themselves as police officers, she was wearing two diamond rings, one of which they believed might be the stolen ring. When Wagner and Gardner told Thompson that they believed that she might be in possession of a stolen diamond ring, Thompson objected and attempted to walk away from them to call her husband. Wagner blocked her path and put her in handcuffs. When Thompson attempted to walk away, she committed the physical act necessary to constitute obstruction of a peace officer.

Moreover, there was some reasonable basis for the Officers to believe that Thompson's walking away might impede, hinder, interrupt, prevent or delay their performance of their duty to

investigate the theft of the diamond ring. Thompson was, as Meyers reported, wearing a diamond ring on her left hand which could be easily lost or concealed. It was reasonable for Wagner and Gardner to believe, at that time, that Thompson might be leaving the area not to call her husband but to dispose of stolen property.

It is immaterial that it was later discovered that neither the ring produced by Meyers nor Thompson's rings could have been one of the stolen rings. This inquiry is focused on what Wagner and Gardner knew at the time of the arrest. On May 17, 2001, they had reason to believe that one of the stolen diamonds might be in the possession of Thompson. They were told this by Meyers who had admitted to them that he had previously been in possession of the stolen ring in question and had produced what he stated, and what the Officers also had reason to believe, was one of the stolen ring settings. Thus, there was a reasonable basis to conclude that probable cause existed; and, therefore, Wagner and Gardner are entitled to qualified immunity.

Because this Court has determined that the Officers are entitled to qualified immunity, it need not reach the issue of whether Wagner and Gardner actually had probable cause.

## CONCLUSION

For the reasons stated herein, Plaintiff's Motion for Summary Judgment is denied, and Defendants' Motion for Summary Judgment is granted.

**IT IS SO ORDERED.**

John W. Darrah, Judge
United States District Court

Date: March 21, 2002